[Civ. No. 30872. First Dist., Div. One. May 10, 1972.]

ROBERT J. WILLIAMS, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

James C. Hooley, Public Defender, and Dean A. Beaupre, Assistant Public Defender, for Petitioner.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, John T. Murphy and Rodney J. Blonien, Deputy Attorneys General, for Respondent and Real Party in Interest.

**OPINION**

**ELKINGTON, J.**—In this matter we issued an alternative writ of mandate on Robert James Williams' petition for the purpose of reviewing a superior court order denying suppression of certain evidence in proceedings taken under Penal Code section 1538.5.

In a municipal court preliminary hearing Williams was identified by one

Loren Carlson as the person who had robbed him and shot at him with a deadly weapon. The court, on this testimony, found probable cause to believe that Williams had perpetrated the crimes, and held him to answer for them in the superior court.

There is no dispute as to the facts.

On December 10, 1970, a police officer went to a hotel to investigate a complaint involving an abandoned car registered to one Tyree Vickers. There were also outstanding traffic warrants "for the car." He learned that no person named Tyree Vickers lived there, but that a Tyree Odin did. He and the manager went to Tyree Odin's room which the manager opened with a key. The officer entered and observed two closed briefcases; one was inside the closet and the other just outside. He opened the briefcase in the closet to determine whether the Tyree Odin who occupied the room was the same person as Tyree Vickers. Inside he found a driver's license "for a Caucasian male." He had been told that Vickers and Odin were black. The officer then asked the manager "not to disturb anything and notify us when Vickers or Odin returned to the room." Because the manager "suspected that he was dealing in narcotics," the officer gave the information he had acquired to the police "Special Services Bureau."

Two days later the hotel manager reported that Odin had returned. This time two other officers who knew about the briefcase in the closet responded, and knocked on Odin's door. There was no answer so the officers "cheated the lock and gained entrance into the room." No one was present, but on the bed was a "large plastic bag containing numerous blue Valium tablets." The tablets were seized.

An hour later the officers returned. This time they knocked on the door and announced they were police with a traffic warrant for Tyree Vickers. The door was opened by a man holding a revolver in his hand. One of the officers drew his revolver and ordered that the other weapon be dropped, which was done. The man said he was Tyree Vickers, whereupon he was placed "under arrest for the outstanding traffic warrants and also for possession of Valium." The officers looked for and found the earlier reported briefcase in the closet. Inside the briefcase they found "identification of Mr. [Loren] Carlson and the identification of Mr. [Robert J.] Williams," the petitioner in the instant proceedings. Williams and Vickers (or Odin) were different persons.

Loren Carlson was known to have been a robbery victim. Because of the association of his "identification" with that of Williams, the police showed Carlson nine photographs including one of Williams. The identi-

fication of Williams as Carlson's attacker led to the superior court robbery and assault charges, and the instant mandate proceedings.

All agree that the successive clandestine police entries into the hotel room, and the opening and search of the briefcase, were violations of the Fourth Amendment. We think they were gross violations.

Williams' Penal Code section 1538.5 motion to suppress was directed to the contents of the briefcase, including both "identifications" found therein. It was also directed to the evidence of Williams' "photographic lineup" at which he was identified by Carlson.

No contention was made that Carlson's courtroom identification of Williams should also be suppressed, if it could be shown at the trial that identification, independently of the photographic lineup, "was possible."

The trial court granted Williams' motion to suppress evidence of the contents of the briefcase. However, it denied the motion insofar as it related to the evidence of the photographic lineup. It is the latter portion of the court's ruling which is the subject of the instant writ proceedings.

In this court Williams states his narrow contention as "[T]he *photographic identification* of the defendant should be suppressed. If there is an independent ground for the identification of the defendant, then the People could proceed on that basis." He argues that the photographic identification was a "fruit of the forbidden tree"—the above related Fourth Amendment breaches by the police.

Williams' concession that the police conduct did not taint Carlson's prospective courtroom identification undoubtedly results from the decision in *Lockridge* v. *Superior Court,* 3 Cal.3d 166 [89 Cal.Rptr. 731, 474 P.2d 683]. In that case, in the course of an admitted Fourth Amendment violation, police obtained the serial number of a gun which led them to an earlier sheriff's arrest report disclosing the gun to have been taken in a robbery. The report in turn led to the robbery victims who identified Lockridge and another as the robbers when shown police photographs. But for their earlier constitutional breach, the police would not have been led to the victims.

The *Lockridge* court concluded that the "illegal discovery of the gun [was not] sufficient to characterize the [victim's] testimony as 'come at by exploitation of that illegality.' " The court added: "The purpose of the exclusionary rule is to deter unlawful police conduct. . . . In the present case, that purpose was adequately served by suppressing the gun and the evidence of the other crimes that the police were seeking. That purpose

would not be further advanced by suppressing the testimony of the known victims of the Pesce robbery; testimony that unquestionably would have been admissible to establish petitioners' guilt of that crime, but for the chance disclosure of their connection therewith during a wholly unrelated police investigation." (P. 171.)

The holding of *Lockridge* obviously is applicable to Carlson's prospective courtroom identification of Williams. We perceive no logical reason why it is not equally applicable to Carlson's photographic identification. Neither authority nor persuasive argument is offered by Williams supporting the distinction made by him.

The peremptory writ of mandate will be denied; the alternative writ is discharged.

Molinari, P. J., and Sims, J., concurred.