[Crim. No. 6904. Fourth Dist., Div. One. July 28, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY DUANE DOWDY, Defendant and Appellant.

**COUNSEL**

Paul Bell, Alan S. Rich and Ted Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Bernard A. Delaney and Yvonne H. Behart, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**AULT, J.**—Charged with, and convicted by a jury of, two counts of burglary (Pen. Code, § 459-2d degree), defendant Larry Duane Dowdy was sentenced to serve concurrent terms in prison.[1] He appeals, contending:

(1) the trial court erred in permitting testimonial references to evidence which had been previously suppressed as having been obtained as the result of an unlawful search, and

(2) the trial court abused its discretion in allowing testimony of prior similar acts and conduct.

### FACTS

On December 27, 1973, as Daniel Tuck was riding his bicycle to his home in the Ocean Beach area of San Diego after completing his nightshift as a bartender, he noticed the front glass door of Stella's Pet Shop had been broken in with an old tire. After he dismounted to investigate, and while he was observing the scene, defendant Larry Duane Dowdy rode up on a bicycle and crashed into a palm tree in front of the pet shop. Tuck and Dowdy discussed what action to take and Tuck then rode to the nearby police community relations office to report the broken door. The office was closed and when Tuck returned to the pet shop a few minutes later, he found Dowdy had entered. Tuck entered also and suggested that Dowdy call the police on the shop telephone. Dowdy called the police and reported the incident. Tuck noticed that Dowdy's speech was slurred, his walk unsteady and concluded Dowdy was under the influence of alcohol—"or something."

A few minutes later Officer Harris arrived on the scene in response to a police radio message. He questioned Tuck, Dowdy, and a neighbor who had come to the pet shop by that time. Harris requested the police radio operator to notify the owner of the pet shop of the break-in. Harris concluded Dowdy was under the influence of alcohol. Outside the pet shop Harris found a large aquarium which he left with the neighbor for safekeeping. Dowdy was not detained.

---

[1]The superior court file, which we have ordered lodged with this court, reveals that Dowdy's sentence was recalled pursuant to Penal Code section 1168 and he was granted probation for five years on condition that he serve nine months in the custody of the sheriff. The appeal, however, was perfected from the judgment originally entered.

Later the owner of the pet shop identified the aquarium as having been taken from the store and stated that a large yellow-crested cockatoo with black feet, and its cage, were also missing. The cockatoo was being boarded by the pet shop for its owner, Dave Donaldson.

In the early morning hours of January 5, 1974, Officer Michael Duffy received a radio call indicating a silent burglar alarm had been activated at the Jagar Company, a jewelry store in the Ocean Beach area. Duffy went to the store and noticed that three or four louvers from the window next to the door had been removed. He reached inside, opened the door, and entered, accompanied by another officer who had arrived by that time. Duffy went over to the cash register counter and, using his flashlight, saw Dowdy lying on the floor behind the counter. Duffy told Dowdy to stand up. Asked why he was there, Dowdy stated he had just come in to sleep. Duffy noticed Dowdy had four rings on his fingers and two bracelets on his wrists. He also noticed the jewelry was Indian-type, similar to that displayed about the store. Duffy placed Dowdy under arrest and searched him. He found ten, crisp $20 bills, one $10 bill, one $5 bill and five $1 bills in his wallet. Several hundred dollars worth of jewelry had been placed in a shopping bag which was found near the cash register counter. Dowdy did not appear to be intoxicated or under the influence of alcohol.

Investigation of the Jagar Company burglary was assigned to Detective Raymond Dobbs who interrogated Dowdy at the jail on the morning of January 5. Dowdy gave his address as 1621 Ocean Front in Ocean Beach. Later that morning, Dobbs went to 1621 Ocean Front to verify the address. He saw Dowdy's name on a mail box located at a point from which his view of the house was totally obscured. He entered the yard through a gate in a five-foot-high solid board fence and came to a second fence of wire construction. An electric doorbell was attached to the gate of this fence. Dobbs tried the bell, received no response, went through the gate and knocked at the door of Dowdy's house. Still receiving no response, Dobbs peered through the front room window and sighted a large white bird in a cage. Dobbs believed the bird to be a cockatoo. A tenant who lived in the upstairs apartment of the house confirmed that Dowdy and his brother lived below.

Dobbs recalled humorous references to a stolen cockatoo in the burglary division of the police department. Two days later, on January 7, he contacted Detective Haynes who had been assigned to the pet shop burglary. Without obtaining a search warrant, Dobbs and Haynes went

to 1621 Ocean Front, proceeded through both gates and knocked on the front and rear doors. Receiving no reply, Haynes forced open the rear, wooden door and entered the residence. Dowdy and his brother were arrested and the officers seized the cockatoo and some other items suspected of being stolen property.

Dowdy moved to suppress evidence under Penal Code section 1538.5, stating in his motion "the evidence sought to [be] suppressed in Count One is the bird, allegedly a cockatoo." The motion was granted; the order stating, "the cockatoo. . . taken from 1621 Ocean Front" was suppressed.

DISCUSSION

## I. The Pet Shop Burglary

While proof of actual theft is not necessary to establish a burglary, the facts of the pet shop burglary charged against Dowdy were such that it was essential to the People's case to tie Dowdy to the stolen cockatoo, or vice versa. Unless that could be done, there would be no evidentiary basis to support a finding that Dowdy had entered the pet shop to commit theft. What should have been a simple task became complicated when the police officers broke down the door to Dowdy's home, entered without a warrant and seized the cockatoo. This unlawful act resulted in a court order suppressing the cockatoo. Undaunted by this minor setback, the People decided to go forward without the bird.

Undoubtedly, the People were encouraged in this endeavor by the fact the officers had spotted a white bird through Dowdy's window before they broke down the door. (Dobbs had seen a white bird from outside the house on January 5, and both Dobbs and Haynes saw the bird on January 7, before they broke into the house.) Arguably at least, these observations were untainted by the later unlawful seizure of the bird. (see *Lockridge* v. *Superior Court,* 3 Cal.3d 166, 169 [89 Cal.Rptr. 731, 474 P.2d 683]), and, arguably at least, they were not proscribed by the order of suppression which, by its terms, referred only to "the cockatoo . . . taken from 1621 Ocean Front." So the People put this evidence on, almost unhindered by defense counsel.

The problem was that the People had to prove, or thought they had to prove, that the bird the officers saw through the window was the same bird which had been stolen from the pet shop, i.e., the cockatoo, and the

cockatoo had been suppressed.[2] To overcome this obstacle, the People called Mr. Donaldson, the owner of the cockatoo. In response to questions by the prosecutor, Donaldson testified he had boarded the cockatoo at the pet shop in late December, found it had been stolen soon after the event occurred, and next saw it when he went to the police station after the police had called, stated they had a cockatoo at the station and asked him to come down and see if it was his. "Was it your bird?" asked the prosecutor. "It was very easy to identify." Donaldson replied. The question was repeated: "Was it your bird?" "Yes, it was." came the reply.

To clinch identification of the cockatoo as the stolen bird, Donaldson testified on re-direct examination:

"A No, the cage was the same—the same bell that I had in the cage—was the same cage. The cage was bent in the areas that he always used to bend the cage up—I mean—you know—like he used to bend the wire in the cage in certain areas. . . . One of the feed cups which he—was broke—was cracked. It was cracked in the same place. So the same locks that I had on the cage were on the cage at the police station when I picked the bird up. We tried to get—they wanted to get the bird out and take a picture of it, and they couldn't get the lock undone because the keys were missing, but you know—there was no question to the fact that it was the same cage—same bird. He had a habit of turning somersaults in the cage.

"Q There was no question in your mind that that was your bird?

"A No. If it wasn't, I wouldn't have accepted the bird from the police—if it wasn't."

This testimony was not even arguably admissible. Identification of the bird as the stolen cockatoo was established by use of the bird after it had been unlawfully seized by the police and in violation of the court order suppressing it. The rule forbidding the acquisition of evidence by illegal means "is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." (*Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385, 392 [64 L.Ed. 319, 321-322, 40 S.Ct.

---

[2]Obviously, to prove A bird was THE stolen bird, THE stolen bird in hand was worth considerably more than two glimpses of A bird through a front room window. Here, the People got the bird in hand initially, but lost it, together with any evidentiary advantage to be gained from its capture, through the officers' unlawful entry of Dowdy's home.

182, 183, 24 A.L.R. 1426]; *Lockridge* v. *Superior Court, supra,* 3 Cal.3d 166, 169.) The rule operates to exclude the indirect as well as the direct products of such invasions (*Wong Sun* v. *United States,* 371 U.S. 471, 484 [9 L.Ed.2d 441, 452-453, 83 S.Ct. 407, 416]), and requires suppression of any evidence, tangible or intangible, "come at by exploitation of that illegality." (371 U.S. at p. 488 [9 L.Ed.2d at p. 455, 83 S.Ct. at p. 417]).

It is fundamental that the People cannot circumvent the exclusionary rule by substituting the officer's testimony describing his observations during the illegal invasion for the physical evidence which has been ordered suppressed (*Wong Sun* v. *United States, supra,* 371 U.S. at p. 485 [9 L.Ed.2d at pp. 453-454, 83 S.Ct. at p. 416]). It should be equally obvious that the People cannot side-step this aspect of the rule through the guise of the officer transporting the illegally seized evidence to the police station and calling an independent witness who viewed it there to describe and identify it.

The Attorney General concedes that Donaldson's identification testimony was improper. However, he argues against reversal because no specific objection was made to the testimony and claims the error was harmless in any event. We reject both arguments.

Illegally acquired evidence is not excluded by objection at trial but by motion and ruling which must be made in advance of the trial (Pen. Code, § 1538.5, subd. (m)). When a defendant obtains a favorable ruling excluding crucial evidence, a prosecutor who elects to proceed without it skates on thin ice. In that circumstance, the defendant has already successfully advanced his objection through the pretrial motion, and the People are in poor position to argue they may ignore the ruling which went against them because further objection was not made at the trial. In any event, some objection to the evidence was voiced at the trial. At the conclusion of the prosecutor's opening statement and before any evidence was introduced, defense counsel stated, "I wish the record to reflect that the defense objects to any evidence of the cockatoo and to reference to it already in the opening statement." The objection was overbroad, and we would expect better. Nevertheless, in light of the court's previous ruling and an apparent preconceived plan by the People to circumvent it, we view the statement as sufficient to alert both the prosecutor and the court that the defense was objecting to the illegally obtained evidence eventually offered and received.[3]

---

[3]Where significant and vital evidence has been suppressed and the People elect to proceed, the situation cries out for a conference between counsel and the trial judge so

Contrary to the Attorney General's contention, the improper evidence was not harmless. It was critical to the People's case. Whether Dowdy could have been sufficiently identified with the stolen cockatoo by inferences to be drawn from properly received evidence is doubtful. We are satisfied that the jury's decision was not based on those inferences, but rather on the positive testimony of Donaldson which was erroneously received.

## II. The Jewelry Store Burglary

■ Dowdy's only contention which bears upon his conviction of the jewelry store burglary is without merit. The trial court did not abuse its discretion in permitting evidence of a burglary of a clothing store committed by him in 1971. The facts were strikingly similar to those involved in the two burglaries charged here. Furthermore, the People had the burden of proving that Dowdy entered the two stores with the intent to steal—and Dowdy denied it. The prior acts were admissible and relevant to show his intent (Evid. Code § 1101, subd. (b)); and consideration of them was carefully limited to that purpose by proper instructions.

The judgment is affirmed as to count II and reversed as to count I.

Brown (Gerald), P. J., and Coughlin, J.,* concurred.

guidelines may be set and prejudicial error avoided. The responsibility for proceeding cautiously and fairly rests heavily on the prosecutor if he wishes to avoid the accusation of attempting to subvert or circumvent the order of the court.

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.